GEORGE A. WOOLSTON, Administrator of the Estate of ALFRED B. WOOLSTON, Deceased, Respondent, v. SAMUEL J. BLYTHE, et al., Appellants.

In the Kansas City Court of Appeals, April 2, 1923.

1. **ABATEMENT AND REVIVAL:** Procedure: Pleading: Discretion of Court: Trial Court Did Not Abuse its Discretion in Refusing to Permit an Amended Answer to be Filed at Close of Plaintiff's Testimony, Alleging Want of Capacity in Plaintiff to Maintain Suit, and in Ordering Trial to Proceed to Verdict and Judgment. Sections 1346, 1347 and 1351, Revised Statutes 1919, in reference to abatement and revival of actions, presuppose that the suggestion of death or disability of a party has been timely made, and it was within the discretion of the trial court to refuse to permit an amended answer to be filed at close of plaintiff's testimony, alleging incapacity of plaintiff to maintain suit, praying abatement of action therefor and to order trial to proceed to verdict and judgment.

2. **WATER AND WATERCOURSES:** Damages: Overflow: Damage Resulting from Overflow of Land Held Not Permanent Injury Which Must be Sought and Recovered in One Action, But as Damage Was Recurrent it May be Sued for Separately. In an action to recover damages alleged to have been sustained by reason of wrongful diversion of a watercourse caused by defendants in cutting the bank thereof so that a creek overflowed plaintiff's lands during times of high waters, but which could have been abated at any time, *held* that the diversion of the creek was not a permanent injury to the lands for which all damages must be sought and recovered in one cause of action, but the damage being recurrent, the water overflowing creek from year to year, causing loss of use of land, it could be sued for separately.

3. ———: ———: ———: Plaintiff Held Entitled to Recover Damages for the Loss of the Use or Rental Value of Land During Time Overflow Prevented Use Thereof. Where plaintiff suffered damages by reason of overflow of land during times of high water, caused by acts of defendants in cutting bank of a creek, which injury to land was temporary and subject to abatement, *held* plaintiff was properly entitled to damages for the loss of the use or rental value of the land during the time the overflow prevented use thereof.

4. ———: ———: ———: Pleading: Averment of Petition Held Broad Enough to Authorize Recovery for Loss of Use or Rental Value of Land. Where count of petition for recovery of damages caused by overflow of lands, charged that plaintiff's intestate was deprived of the use of the premises for a certain year, *held* broad enough to authorize recovery for the loss of the use of the land or rental value thereof, notwithstanding evidence as to the value of crops had been properly stricken out.

5. INSTRUCTIONS: An Instruction on Preponderance of Evidence Held Not Erroneous. An instruction that the terms preponderance of evidence, or greater weight of evidence, does not mean the greater number of witnesses, but means the evidence which is more satisfying and convincing to the minds of the jury, *held* not erroneous for omitting word "necessarily" preceeding word "mean" therein.

6. TRIAL PRACTICE: Discharge of Jury: Where Petition and Evidence Were sufficient to Authorize Recovery of Damages for Loss of Use of Land, and There Was no Claim for Damages to Crops, Court Did Not Err in Refusing to Discharge Jury After Sustaining Motion to Strike Out Evidence as to Damage to Growing Crops. In an action to recover damages for overflow of lands where petition and evidence were sufficient to warrant recovery for rental value of land during loss of use thereof, and there was no claim for damages to crops, the court did not err in refusing to discharge the jury after sustaining defendant's motion to strike out all of the evidence as to amount of damage done to growing crops.

7. WATERS AND WATERCOURSES: Damages: Evidence: Evidence as to Debris Thrown upon Lands, in Action for Damages Caused by Overflow Thereof, Held Admissible to Show Loss of Use Thereof. In action to recover damages for overflow of lands, the court did not err in refusing to sustain motion to strike out all testimony with reference to logs, brush and debris thrown upon the lands by reason thereof, as such evidence was competent as tending to show whether plaintiff was deprived of the use of the land.

8. INSTRUCTIONS: Requested Instruction Held Properly Refused Because it Omitted Essential Facts and Because Defendants' Rights, Insofar as They Existed, Were Covered by Another Instruction Given for Defendants. In an action to recover damages for overflow of lands, an instruction requested by defendants to the effect that if jury found there was a gap in the plaintiff's levee, and that the water or overflow was running in a channel through said gap and over the lands of plaintiff, their verdict should be for defendants, was properly refused because it ignored the acts of defendants in diverting that part of the stream which was flowing

Woolston v. Blythe.

upon the lands, and because the question was covered by another instruction for defendants.

9. ———: **An Instruction as to Elements of Damages Caused by Overflow of Lands Held Properly Refused Because Covered by Another Instruction.** A requested instruction of defendants that all of the evidence as to the value of crops injured or destroyed was withdrawn from consideration of jury, was properly refused where court had given an instruction that plaintiff was not entitled to recover the value of any crops destroyed.

### ON REHEARING.

10. ———: **Punitive Damages: Malice: An Instruction Which Did Not Restrict Jury to an Award of Punitive Damages Against Only Such Defendants as Acted Maliciously but Permitted an Assessment Thereof Against all of Defendants, Held Not Erroneous.** In an action for damages caused by overflow of lands where the evidence showed that if defendants committed the acts complained of and any one of them was guilty of malice, then all were guilty for the reason that all participated in the diverting of the channel, knowing the consequences, an instruction permitting jury to assess punitive damages was not erroneous because it did not limit the recovery of such damages only to defendants guilty of malice.

11. **WATER AND WATERCOURSES: Malice: Actual: Implied: Where Defendant Knew Effect of His Act in Diverting Water onto Plaintiff's Land, Although There Was no Evidence of Actual Malice, Held Guilty of Implied Malice.** Where defendant lived in the neighborhood, was acquainted with creek and its various changes for years, assisted in repairing levees, knew the situation of plaintiff's land and the effect of his own act in diverting the channel of the stream to the land of plaintiff, *held* guilty of implied malice in making diversion thereof, there being no evidence of actual malice.

12. **INSTRUCTION: Punitive Damages: If Defendants Desired an Instruction Limiting Assessment of Punitive Damages to Amount Imposed upon the Defendant That Was Least Culpable, They Should Have Requested Same.** Where an instruction authorized the assessment of punitive damages against all defendants, and evidence showed they were guilty of implied malice, there being no evidence that any of them were guilty of express malice, *held* proper so far as it went, and if defendants desired an instruction that the amount of such damages should be limited to that imposed upon the defendant least culpable, they should have requested it.

13. ———: **Instruction Held to Require Finding That Acts Were Not Only Wrongfully and Intentionally Committed, But Were Known by**

Defendants to Have Been Wrongful. An instruction defining "maliciously" as the intentional doing of a wrongful act without regard to the rights of others, and warranting assessment of punitive damages if the acts were wrongfully and intentionally committed, was not erroneous in that it did not require jury to find that the acts of defendant were known by them to have been wrongful, as the instruction as worded did require jury to so find.

14. PLEADING: Petition Held Not to Admit Lands Were Rented for Cash Rental Instead of to a Cropper on Shares so as to Preclude Recovery for Loss of Use During Time Lands Were Rendered Unfit for Cultivation Caused by Overflow. In an action to recover damages for overflow of lands where petition alleged that lands were leased for one-half of the corn to be raised thereon during the year, *held* not to admit that the lands were "rented" in a technical sense for a cash rental as distinguished from cultivation thereof by a cropper on shares so as to preclude plaintiff from recovering any damages during time lands were rendered unfit for cultivation.

15. ————: After Verdict, Petition Must be Construed in Most Favorable Light to Plaintiff. After verdict, petition must be construed in a favorable light to plaintiff.

16. INSTRUCTIONS: An Instruction for Defendant Denying Recovery Held Properly Refused as Confusing in Not Telling Jury What Was Meant by Word "Rented" Used Therein, Because if Parties in Possession of Land Were Mere Croppers and Not Tenants, Plaintiff Was Entitled to Recover for Loss of Use of Land. An instruction requested by defendant to the effect that plaintiff could not recover damages for overflow of land if land was rented during time of overflow, was properly refused, as it tended to confuse the jury by not telling jury what was meant by word "rented" it not being seriously disputed that if the parties tilling the soil were mere croppers and not tenants, the right of possession of the land was in plaintiff who was entitled to recover for the loss of the use thereof.

17. ————: Assuming Facts: An Instruction Held Properly Refused as Assuming Fact Which Was an Issue for Jury. In an action to recover damages for loss of use of land by overflow, a requested instruction that defendants had the right to cut willows on their land and to remove the logs and debris therefrom in order to cause flood or rain waters to flow off their land, even though such waters were thereby caused to flow onto lands of plaintiff, was properly refused because it assumed as a fact that defendants cut the willows on their land and removed the debris therefrom for the

purpose of preventing overflow waters from remaining thereon, which was an issue for the jury.

18. ———: An Instruction That Defendants Were Not Liable for Overflow of Lands Held Properly Refused as Being Confusing. An instruction requested by defendants that they had a right to cut willows from the bank of a creek on their land and remove the willows and logs and debris from the space where the willows had been cut, and to place the same against the willows that remained standing, and if they did so and thereafter a rain or freshet occurred and broke or overflowed the banks of the creek, and that none of the defendants cut the bank of the creek and did not thereby obstruct the flow of water, the jury should find for the defendants, *held* that if it was intended to instruct jury thereby that defendants would not be liable for overflow waters, the instruction was properly refused as confusing, particularly where there was evidence that defendants had cut a place eight or ten feet wide out of side of the creek bank but not entirely through the same.

19. **WATER AND WATERCOURSES:** Where Defendants Cut Partly Through Creek Bank Which Caused Creek in Time of High Water to Break Through at That Point and Overflow Lands of Plaintiff, the Defendants Were Liable. If defendants on their own lands dug a place eight or ten feet wide out of the side of a creek bank at point where they had cut a swath in the willows as a result of which the creek in time of high water broke through the bank and was caused to overflow plaintiff's lands, the defendants were liable for any damage caused thereby.

20. **JUDGMENT:** Injunction Bond: Res Adjudicata: A Judgment in an Injunction Proceeding and Assessment of Damages upon Injunction Bond, Held Not Res Adjudicata, Relieving Sureties Thereon, Who Were Not Parties to an Action for Damages, Caused by Their Own Affirmative Acts. Where a bond was given to a landowner to protect him from damages as a result of an injunction against him preventing him from repairing a levee, a recovery thereon for damages sustained was limited to the actual, natural and proximate result of the wrong committed by the order enjoining the repair of the levee, and therefore not *res adjudicata* against defendants, some of whom were sureties upon the injunction bond, for their acts in cutting the bank of a creek which caused creek in time of high waters to break through at that point and overflow plaintiff's lands.

Appeal from the Circuit Court of Buchanan County.— *Hon. Thos. B. Allen,* Judge.

AFFIRMED.

*James H. Hull* and *Strop & Silverman* for respondent.

*Waggoner, Challiss & Crane* and *Culver, Phillip & Voorhees* for appellants.

ARNOLD, J.—This is an action to recover damages alleged to have been sustained by reason of the wrongful diversion of Sugar Creek, a watercourse in Buchanan and Platte counties, in Missouri.

The petition charges that defendants, acting together in conspiracy, turned the waters of said creek from the channel in which the same had theretofore been running across the lands of plaintiff, resulting in the loss of the use of said lands during the years 1908, 1909 and 1910. The record shows that Sugar Creek is a living stream flowing from the hills in Buchanan county upon the bottom lands in Platte county. In dry seasons it runs only a small quantity of water but in seasons of rainfall a large volume flows, making it difficult to keep the creek within its banks. In former years the creek flowed into a body of water known as Sugar Lake, but in course of time that body became divided into two parts, known as Big Sugar Lake and Little Sugar Lake, and the mouth of the creek prior to 1902, or 1903, was Big Sugar Lake. At that time the general course of the stream, after reaching the flat land, was first in a southwesterly direction, thence westerly, and thence northwesterly into Big Sugar Lake. About 1902, or 1903, at about the point where the creek turned northwesterly, the banks became broken during a freshet and the creek turned its course southward and thence flowed almost due south into Little Bean Lake.

Prior to the acquisition by defendants of a tract of land known as ''No Man's Land,'' levees and dikes had been maintained by the landowners for the purpose of confining the waters of the creek within its channel.

When these levees became broken by reason of freshets, persons whose lands were affected entered upon the lands and repaired the breaks wherever they occurred. After the break to the south and the change in the course of the creek above referred to, the channel to the northwest leading to Big Sugar Lake became partially filled with logs and drift, thereby impeding the flow of water in that direction. That is to say, during high waters, part of the body of water flowed out through the old channel and part south into Little Bean Lake, making in a short time a permanent channel southward of such proportions that the county erected a bridge across it for use in connection with a public road.

The lands of plaintiff's intestate lie west of both the old northwest channel and the channel to the south. Defendants own lands bordering on the creek some of which lie above the lands of plaintiff and some of the defendants' lands adjoin the creek as it flows south to Little Bean Lake.

The land upon which the break of 1902, or 1903, occurred consists of twenty-five acres, known as above indicated as "No Man's Land." During the year 1901, and just prior thereto, some of the defendants desired to change the course of the creek from its channel into Big Sugar Lake to a westerly direction across the lands now owned by George Woolston and by A. B. Woolston his father, now deceased, into Little Sugar Lake. Proceedings had been instituted in the circuit court of Platte county with this purpose in view but nothing was accomplished thereby.

In 1901 defendants and other persons not parties to this suit decided to procure the twenty-five acre tract known as "No Man's Land" and use it to turn the creek in a westerly direction. As part of the scheme, or plan, said tract was purchased by a man named Page, who in turn conveyed it to one of the defendants herein named James P. Coleman, as trustee. This deed was never recorded. The testimony on behalf of defend-

ants tends to show that the reason for having the land thus conveyed was that Coleman lived nearest the land and could look after it. All of the owners lived within a distance of three or four miles. The contributions toward the purchase of the land were in proportion to the land holdings of defendants in the locality, the idea being that each should contribute in proportion to the benefits he would receive. No attempt was made to cultivate the land after its acquisition by Coleman and his associates, excepting for a year or two, and it was permitted to grow up in willows. Upon acquiring the land Coleman posted notices at the corners of it declaring, ''No trespassing or interfering with the levee, by order of James P. Coleman, Trustee.'' By 1908 the willows, which had been allowed to grow undisturbed, had grown to a considerable size, say two and one-half to three inches in diameter, and extended from the bank of the creek west to plaintiff's line. Later, defendants caused a large tree which was standing on the bank of the old northwest channel to be felled across the channel, and willows to be cut from the other banks across the channel on that side. The record further shows that in 1907 George A. Woolston had built a levee along the east line of his land and that this levee was broken by a freshet in the fall of that year. The water ran through this break on to the Woolston land only so long as the high water lasted and then went back into the southward channel; that in the spring of 1908 Woolston commenced to repair this break in his levee but before he could complete this work he was stopped by a temporary restraining order instituted in the name of B. F. Moore. At the trial this temporary injunction was dissolved. The appellants herein were sureties on Moore's injunction bond.

A week or ten days before the injunction suit was filed and the injunction served, defendants agreed among themselves to cut the willows from the creek bank to Woolston's land. The time fixed for this work was the day after the service of the order of injunction.

On the day Woolston was notified of the injunction, defendants herein and their employees appeared on "No Man's Land" and began cutting a swath through the willows, beginning at the west bank of Sugar Creek at the point where it turned south and westerly to Woolston's east line. This swath was from thirty to fifty feet in width and extended in a straight line from the creek to the east line of Woolston's land. Part of the cut willows were burned in the swath, while others were placed alongside, among the uncut willows, and still others were dragged upon the banks of the creek, south of the land. The logs and other drift in the cut swath were dragged out. All high points in the swath were cut down, or graded, and the swath thus completed presented an unobstructed passage its entire length. There was no water running into the swath at that time. A substantial wire fence was upon the east line of Woolston's land. Where the cut swath encountered this fence, the fence posts were cut off even with the ground, the wire cut, and the section thereof so cut was swung backward and the banks of the creek at that point cut down to the height of the levee. All this was accomplished within two or three days after the injunction was served.

The record further discloses that a few days after this there came a freshet, the bank broke at the point where the swath joined the George A. Woolston land and the water flowed first onto the George A. Woolston land and then onto the lands of A. B. Woolston, and the creek was turned in that direction. During said freshet, the evidence shows that a number of logs were carried by the stream to the break in the levee, and lodging there, threatened to block the opening. Defendants and their employees went into the creek and rolled out the logs that were too large to float through the opening and placed them across the south channel to prevent the water going in that direction. It is charged that this conduct of defendants threw the waters of the creek first onto the lands of George A. Woolston and thence upon

those of A. B. Woolston, consisting of approximately 160 acres, thereby destroying the use of said lands for the years 1908, 1909 and 1910.

This suit was instituted by A. B. Woolston on August 17, 1911, to recover damages for said years. The second amended petition, filed February 12, 1918, was in three counts; the first claimed $4200 actual and $5,000 punitive damages for injury to crops and for rendering the residence, barn and outbuildings untenable for the year 1908; the second charged like damages in the sum of $2900 actual and $3,000 punitive damages for the year 1909, and the third claiming like damages in the sum of $2900 actual and $3000 punitive damages for the year 1910. After the institution of this suit A. B. Woolston died and the suit was revived in the name of George A. Woolston, administrator, the present plaintiff, who on the day the trial began filed an amended petition alleging that he had been appointed and was then the duly qualified and acting administrator of the estate of Alfred B. Woolston. This allegation was denied in the answer filed on the same day.

At the close of plaintiff's case defendants suggested and proved that on April 4, 1917, the plaintiff had filed his final settlement and had been finally discharged as administrator of the estate of A. B. Woolston. Defendants then moved the court to abate the action because George A. Woolston was not then such administrator. The motion to abate was overruled by the court, whereupon defendants asked leave to amend their answer by setting up said facts. The court first ruled that the answer could be so amended and that the plaintiff might move to strike out the amendment, and this was done. After arguments by counsel, the court ruled as follows:

"Gentlemen, the defendants ask leave to file an amended answer in the case, setting up the incompetency of plaintiff. I don't agree with Judge Strop on the principle that they have waived by having answered already. My notion is that at any time that they legally have the

answer and set it up that that has the effect—upon the proof sustaining that answer—of abating the suit. Therefore, the court is in the position here, if I permit this answer to be filed under my notion of the case, I will have to and I will be compelled to abate the suit; that would follow. Therefore, it comes down to a matter of pure and simple discretion. This amendment is not an amendment that goes to the merits of the case; has nothing to do with the justice between these parties or adjudicating their rights. It is only a matter which says in effect, shall the case go on or not, and the discretion of the court must determine whether this case should go on or not. In view of the fact that if I refuse this answer to be filed the case automatically goes on and the case will be tried and tried out in the issues, and decided upon its merits. On the other hand, as I said, if I permit it to be filed, then it follows inevitably that the case must abate, I think it is the sound discretion of the court to leave this case where the parties have already placed themselves. I don't think that it is the province of the court to come in and offer any assistance to either party where the parties themselves have taken the position they have. Therefore, the court will not grant leave to file the amended answer. You may make any record you wish.''

The court returned a verdict upon the first count for $400 actual and $1,000 punitive damages, and on the second and third counts each $400 actual damages. Judgment therefor was accordingly entered of record. Defendants appeal.

Separate briefs have been filed in the case by each of the two firms of attorneys engaged in the defense, each dealing with some particular phase of the case, and at the same time duplicating many points. We shall endeavor to treat them as one brief.

The first point upon which the appeal is based is that the court erred in refusing to abate the suit upon the suggestion and proof that plaintiff had ceased to

be administrator of the estate of Alfred B. Woolston, deceased, and in ruling that it was within the discretion of the court to permit the trial to proceed to verdict and judgment. This contention is based chiefly upon the provisions of sections 1346, 1347 and 1351, Revised Statutes 1919, relative to abatement and revival of actions.

Section 1346 provides: "No action shall abate by the death, marriage or other disability of a party, if the cause of action survive or continue. In case of the death, marriage or other disability of a party, the court, on or before the third term after the suggestion of such death, marriage or disability, may, on motion, order the action to be continued by or against the representative or successor of such party in interest. When the cause of action does not survive, the action shall abate only as to the deceased parties, and shall continue as to the survivors, if any, without a revival thereof."

Section 1347 provides: "After the suggestion of the death, marriage or disability, the order may be made on the motion of the adverse party, or of the representatives or successor of the party who died or whose power ceased, and the names and capacities of the representatives or successor shall be stated in the order."

Section 1351 provides: "In all cases where the representatives of a deceased or disabled party shall not be made parties according to the provisions of this article, on or before the third term after the suggestion of the death or disability, the action shall abate as to such party and the interest of his representatives or successor therein; and the cause shall proceed in favor of or against the survivors. In case there be no surviving plaintiff or defendant, the suit shall be dismissed."

These sections presuppose, of course, that the suggestion of death or disability has been timely made. The record shows, as above indicated, that the suggestion of the discharge of the administrator of the estate of Alfred B. Woolston, deceased, was made by counsel for defendants after the issues had been made by the

pleadings of both plaintiff and defendants, and not until after plaintiff had presented the testimony in support of his case. The law seems to be well settled as to the construction to be given these statutes, and the citations of defendant are found not to be in conflict therewith. In Beattie Mfg. Co. v. Gerardi, 214 S. W. 189, 192, it is said:

"Lastly, the appellant urges that the trial court abused its discretion in refusing her request to file an amended answer at the close of the case especially denying the representative character of the plaintiff, that she should have been permitted to amend her pleadings to conform to the proof. The only basis for this contention is the alleged admission, and for the reasons stated such admission is wholly without influence in the case.

"If the defendant intended to deny the capacity in which plaintiffs sued, she should have made a specific denial of the allegations of the petition in the nature of a plea in abatement. As the pleadings stood when the trial began, the plaintiffs were not put to the proof of those facts to maintain their case. Certainly after they had closed their case it cannot be said that the trial court failed to exercise a sound discretion in then refusing to permit an answer to be filed putting in issue for the first time plaintiffs' capacity to sue. [Levels v. Railroad, 196 Mo. loc. cit. 614, 94 S. W. 275.]"

In the Levels Case the court said, at p. 614:

"If the defendant intended to deny the capacity in which the plaintiff sued, it should have made a specific denial of the allegations of the petition in that respect in the nature of a plea in abatement. The general denial is addressed to the merits of the case and does not put in issue those facts which are raised only by a plea in abatement. Plaintiffs were not put to the proof of those facts to maintain their case as the pleadings stood when the trial began and the trial court wisely ruled that it would not further the ends of justice under

214 M. A.—2

the circumstances of the case to allow the issue to be raised after the trial had progressed."

Of like tenor is the opinion of the Supreme Court in Dudley v. Railroad, 238 Mo. 184. Under these authorities it is clear the court committed no error in its rulings on this point.

Complaint is also lodged against plaintiff's instructions numbered 7 and 9 which relate to the measure of damages upon counts 2 and 3 of the petition. This objection is directed to the question of the basis for damages, involving several questions. First, whether the injury was permanent or subject to abatement; second, what damages could be recovered if the injury was temporary and subject to abatement; third, if permanent, is the measure of damages the injury to the land, or, may it also include its use and occupation and actual loss of rents; fourth, if it may include these three elements, may plaintiff sue for less than all of his damages.

As to the first point, we hold the injury was not what is known in law as of permanent character. It could have been abated at any time; therefore, a suit for permanent injury to the land could not have been maintained. The damage was recurrent as the water overflowed the creek, and was to the use of the land. It would seem, therefore, that a claim for damage for the loss of crops was not tenable; nor is the claim of defendants that all damage should have been sought in one cause of action, one that can be sustained.

Defendants' theory is that the diversion of the creek was a permanent injury to the lands, accruing once for all to the lands and the cropowner at that time. This was an abatable injury and the damage for the use of the land from year to year may be sued for separately. [Wilkerson v. Railway, 224 S. W. 72; Scheurich v. Electric Co., 188 S. W. 114; Hayes v. Railroad, 177 Mo. App. 201, 162 S. W. 266; Frederick v. City, 201 S. W. 1147.] In the Frederick case, p. 1149, the court said:

"When the source of the injury may be removed at any time, the measure of damages is the actual damage sustained up to the bringing of the suit."

In Dickson v. Railroad, 71 Mo. 575, the Supreme Court quoted with approval from Van Hoozier v. Railroad, 70 Mo. 145, where it was held:

"In cases of nuisance the rule is well settled that the plaintiff cannot recover for injuries not sustained when his action is commenced. It is equally well settled that when the injury inflicted is of a permanent character and goes to the entire value of the estate, the whole injury is suffered at once, and a recovery should be had, therefore, in a single suit, and no subsequent action can be maintained for the continuance of such injury. But when the wrong done does not involve the entire destruction of the estate, or its beneficial use, but may be apportioned from time to time, separate actions must be brought to recover the damages so sustained."

See also Hayes v. Railroad, supra, and Pinney v. Berry, 61 Mo. 359. In the light of these authorities it is clear the trial court properly held that the nuisance charged was an abatable one. And there can be no valid objection to the instructions authorizing recovery for loss of the rental value of the land, charged in separate counts, for the years involved in this suit. We find no reversible error in this respect.

During the trial, on motion of defendants, evidence as to damage from the crops was properly stricken out. There was nothing remaining in the record upon which to base a recovery except the loss of the use of the land, or the rental value thereof, and the question remains as to whether the petition is broad enough to cover that point. The first count charges "plaintiff's intestate was thereby deprived of the use of said premises for said year," etc. We hold the petition sufficient in this respect.

Defendants also direct a charge of error against instruction No. 12, the point being that said instruction should have stated that a preponderance of evidence does not necessarily mean the greater number of witnesses. The instruction reads:

"The court instructs the jury that by the terms preponderance of evidence, or greater weight of evidence, as used in the instructions given you by the court, is not meant the greater number of witnesses, but said terms do mean the evidence which is more satisfying and convincing to the minds of the jury."

In support of the instruction as given, plaintiff cites Hite v. Railroad, 225 S. W. 916, wherein objection was made to an instruction given in language identical with the one under consideration. The court held the instruction good, citing Hulse v. Railway Co., 214 S. W. 150, 155.

Again, it is urged that the court should have discharged the jury after sustaining defendants' motion to strike out all of the evidence as to the amount of damage done to the growing crops. To this we answer that upon the theory upon which the case was tried, to-wit, that there was no claim for damages to the crops, it does not appear that defendants' cause was in any way prejudiced by this ruling. The action of the court was proper.

As to defendants' charge that the court should have sustained their motion to strike out all the testimony with reference to logs, brush and debris thrown upon the lands during the years in question, we say this evidence was competent as going to the question of whether or not plaintiff was deprived of the use of his land, the very theory upon which the case was tried below.

Defendants charge error in the refusal of the court to give instruction "E" for defendants to the effect that if the jury found from the evidence that on April 14, 1908, there was a gap in the George A. Woolston levee, and that on that date the water or overflow of Sugar Creek, or a substantial part thereof, was running in a channel or channels through said gap and over the lands of George A. Woolston and onto the lands of plaintiff, then their verdict should be for defendants.

We think the instruction was properly refused because it left out any act of defendants in diverting that part of the stream which was at that time flowing into Little Bean Lake, and for the further reason that de-

Woolston v. Blythe.

fendants' given instruction No. 2 covered the question of defendants' rights insofar as they existed, or were entitled to be submitted under the law and the facts in evidence.

Defendants also complain of the action of the court in refusing to give their instruction "F." This instruction covers and includes defendants' contention with reference to the measure of damages; and under another assignment of error, it is charged that the court erred in refusing to instruct the jury that all of the evidence as to the value of the crops injured or destroyed was withdrawn from their consideration. These objections are untenable, in view of that clause in defendants' instruction No. 10 which reads—

"The jury are instructed that the plaintiff is not entitled to recover any damages for injury to his land or premises; nor is he entitled to recover the value of any crops destroyed, and you must not include any such damages in your verdict, even if you find for the plaintiff."

Defendants' refused instruction "H" is based upon the theory that it was the duty of plaintiff to make the damage resulting from the wrongful acts of defendants as light as possible, and if the damage could have been averted, except for the injunction, plaintiff could not recover from defendants. The refusal of this instruction was not error for the reasons above stated relative to the recovery from sureties on the bond in the injunction suit.

ON REHEARING.

BLAND, J.—Plaintiff's instruction No. 10 reads as follows:

"The court instructs the jury that if you find for plaintiff upon the first count of his petition, and further find and believe from the evidence that the acts mentioned in other instructions of this court, and upon which plaintiff's right of recovery depends, as contained in other instructions of this court, were done if at all, wilfully, maliciously and recklessly and in wanton disregard

of the rights of plaintiff, then in addition to compensation for actual damages done, if any, you will allow to plaintiff such exemplary or punitive damages as you may think proper under all of the evidence and circumstances of the case to impose as punishment, not exceeding, however, the sum of five thousand dollars for punitive damages.

"The word 'maliciously' as used in this instruction does not mean spite or ill will, but simply means the intentional doing of a wrongful act without regard to the rights of others.

"The court further instructs the jury that if you find for both compensatory and punitive damages, you will state the amount and kind of damages so found by you separately in your verdict, but you can not find punitive damages on the first count without first finding actual damages upon said count in your verdict."

It is claimed that this instruction is erroneous for the following reasons:

". . . it does not restrict the jury to an award of punitive damages against only such defendants as' acted maliciously, but it permits the jury to assess punitive damages against all of the defendants who were liable for actual damages, even though some of them were not actuated by malice; and because the instruction does not tell the jury that if some of the defendants were guilty of malice and others were not then the jury could not award any punitive damages against *any* of the defendants; and because the instructions should have told the jury that they could not award as punitive damages any *greater sum against the defendant that was least culpable, and for that reason should be punished least.*"

The evidence shows that if defendants committed the acts complained of by plaintiff and any one of them was guilty of malice, then all were guilty for the reason that all of them participated in the diverting of the channel of Sugar Creek to the land of plaintiff's intestate, knowing the consequences. Under the heading of "Malice in law" or implied malice, Bouvier says—

"It is a general rule that when a man commits an act, unaccompanied by any circumstances justifying its commission, the law presumes he has acted with an intent to produce the consequences which have ensued." [2 Bouvier's Law Dictionary (Rawle's 3rd Revision), p. 2068.] There is no evidence of any actual malice in the case. In fact appellants in their reply brief on rehearing state: "There was no evidence on the trial of this case that shows express malice on the part of any of the defendants." However, it is insisted that the defendant Reuben Thomas was not guilty of any malice whatever. The evidence shows that this defendant lived in the neighborhood; that he was fully acquainted with Sugar Creek and its various changes since 1902; that he had assisted in repairing levees; that he knew the situation of the land of plaintiff's intestate; that he helped to cut and pile some of the willows and that he put the sycamore tree in the creek in the spring of 1908. While this defendant was not guilty of actual malice, he knew the effect of his act in diverting the channel of the stream on to the land of plaintiff's intestate and was just as much guilty of implied malice as the other defendants.

As to awarding punitive damages in an amount which the jury believed should be assessed against the least culpable, defendants cite the case of Byrne v. News Corporation and Young, 195 Mo. App. 265. In that case one of the defendants was guilty of actual and the other implied malice but the trial court by reiterating and emphasizing the fact that punitive damages could be assessed, told the jury that it could allow the same amount of damages against the defendant who was guilty of implied malice only that it should assess against the defendant guilty of actual malice. This was wrong because the jury could not assess punitive damages in any greater amount than that which it should find should be imposed upon the defendant that was the least culpable. It was stated in the opinion in that case that it is well known that juries regard actual malice with a

greater degree of culpability than implied malice. In the case at bar there is no question of actual and implied malice involved as we have already stated, and plaintiff's instruction No. 10 was not on the measure of damages and was proper as far as it went. It merely told the jury under what circumstances it could assess punitive damages without telling them how they should be assessed against the defendants. If the defendants wanted an instruction upon this point, they should have requested it.

There is nothing in the point that in defining the word "maliciously" the instruction should have told the jury that the acts were not only wrongfully and intentionally committed but in addition that they must have been known by defendants to have been wrongful. The instruction as worded does this. [Leavell v. Leavell, 122 Mo. App. 654, 658; McNamara v. Transit Co., 182 Mo. 676; Custer v. Kroeger, 240 S. W. 241, 244.]

The contention is made that the court erred in overruling defendants' demurrer to the evidence for the reason that A. B. Woolston had his farm rented for a share of the crops and the tenants were not made parties to the suit, and in giving plaintiff's instructions it allowed a recovery for the rendering of A. B. Woolston's land unfit for cultivation during the years 1908, 1909 and 1910, depriving him of the use of said land during said years, and in refusing defendants' instruction "I" which told the jury that if A. B. Woolston "had his land . . . *rented* during the years 1908, 1909 and 1910, then the plaintiff is not entitled to recover any damages for the year or years during which said lands were *rented*." (Italics ours.) The word "rented" was used in the petition and evidence in this case in a general sense, and as to the year 1908, there is evidence from which we must say that the word was used in the sense of a cropper. There is no evidence introduced by the defendants tending to show that the land was "rented" as that word is used in a technical sense, in the years 1909 and 1910 although such fact was pleaded in the answer.

It is claimed that the petition admitted that the land was "rented" in the year 1908 because it alleged that— "plaintiff's intestate had at said time and during said year of 1908 all of said lands in cultivation and in a condition to be cultivated; that at said time he had fifty acres of corn land at the rental value of fifteen dollars per acre; that said corn land was leased for one-half of the corn to be raised thereon during said year."

It is claimed that because the petition said that the corn lands were "leased" it admitted that the corn lands were rented. However, it is quite apparent from reading the petition, and after verdict it must be construed in a favorable light to plaintiff, that the petition makes no such unqualified admission. It says that plaintiff's intestate at said time had "all of said lands in cultivation," conveying the idea that the lands were in the possession of plaintiff's intestate, and the language following in connection with such language should be so construed as to say that the words "rental" and "lease" were not meant as used in their technical sense, for the reason that if the lands were rented or leased, plaintiff's intestate technically would not have "said lands in cultivation," but the same would have been in cultivation by his tenant. We think that there is no admission in the petition and that there is ample testimony in the record that during the year 1908 the land was tilled by a cropper. The peremptory instruction was, therefore, properly overruled and plaintiff's instructions upon the question were properly given. Under the evidence it was a question for the jury as to whether the tiller of the soil was a cropper or a tenant. [Davies v. Baldwin, 66 Mo. App. 577.]

Defendants' instruction "I" was properly refused for the reason that it tended to confuse the jury by not telling the jury what was meant by the word "rented" and the jury might have found, in view of the way in which that word "rented" was used in the pleadings and the instructions, that although the land was being tilled

by a mere cropper during those years yet the land was "rented." It is not seriously disputed that if the parties tilling the soil were mere croppers and not tenants, the right of possession of the land being in plaintiff's intestate, plaintiff was entitled to recover for the loss of the use of the land.

Instruction "J" was properly refused for the reason that it assumed as a fact that defendants cut the willows on "No Man's Land" and removed the debris therefrom in order to prevent overflow waters from remaining on "No Man's Land." Of course, this was an issue for the jury. The instruction reads in part as follows:

". . . He (the owner of land) has the right to erect a dam or barricade on his own land to prevent such surface waters from coming upon his land or from spreading over or flowing on any part of his land, even though such water is thereby cast upon the land of another. And the defendants had the right to cut the willows on 'No Man's Land' and to remove the logs and debris on said land and to place willows that had been cut along the side of willows that were not cut in order to cause any flood or freshet or rain waters not flowing within the bank of a stream to flow off of 'No Man's Land,' and even though such waters were thereby caused to flow onto the lands of A. B. Woolston, the defendants are not liable for any damages resulting therefrom."

Instructions "K" and "L" were properly refused. It is insisted that these instructions were the only ones that defendants offered that sought to tell the jury that defendants were not liable for any damage that was done to the property of plaintiff's intestate by reason of the fact that the *overflow waters* of Sugar Creek were turned onto it as a consequence of the cutting of the willows and the clearing of 'No Man's Land' if the banks of Sugar Creek were not cut. These instructions are similar. Instruction "L" sought to tell the jury—

". . . that if you believe from the evidence that at the time the defendants cut the willows on 'No Man's

Woolston v. Blythe.

Land,' in 1908 the waters of Sugar Creek were flowing in the channel of said creek to the south across 'No Man's Land,' then the defendants had a right to cut the willows from the banks of said Sugar Creek to George Woolston's land and they had the right to remove the willows and logs and debris from the space where said willows had been cut, and they had the right to place all or any part of the willows that had been cut against the willows that remained standing, and if you believe from the evidence that the defendants did so and that thereafter a rain or freshet occurred and broke or overflowed the banks of Sugar Creek, and that none of the defendants cut the bank of said creek or caused it to be cut, and did not place logs in the channel of Sugar Creek and thereby obstruct the flow of the water therein to the south, and that the waters of Sugar Creek thereafter in 1908, 1909 and 1910, either in time of high water or at the ordinary stage of the water, flowed through the space on which said willows had been cut onto and over the lands of George Woolston and onto the lands of A. B. Woolston, then the defendants are not in any way liable in this case.''

If it was intended to instruct the jury by this instruction that defendants would not be responsible for overflow waters, as well as regular waters of the creek, flowing over the land of plaintiff's intestate if defendants did not cut the bank of the creek, the instructions should have expressly told the jury this without confusing them. Defendants should not have worded the instructions in such a way that the jury could find for them even though they found that the willows were cut over the space leading to the land of plaintiff's intestate and that space cleaned out for the purpose of diverting the channel. Under the instructions they could find for defendants if these acts were done for the purpose of having a freshet break through the banks of the creek and thus have the waters of the channel diverted onto the land of plaintiff's intestate. However, under

such circumstances defendants had no right to do the things which the instructions say they were permitted to do without liability. Witness Barnes testified that when they cut the swath defendants dug a place eight or ten feet wide out of the west side of the creek bank. This digging was at the junction of the swath with the bank. Nothing is said in this instruction about this although it has the jury find that the bank was not cut, which the jury would probably construe to mean not cut through.

Defendants given instructions Nos. 3 and 6 submitted to the jury the circumstances under which defendants would not be liable for diverting the *channel* of Sugar Creek, and if defendants desired to submit an instruction concerning their liability for causing *overflow waters* to flow upon the land of plaintiff's intestate, they should have requested a simple one that would have accomplished that purpose and one that would not have confused the jury as to what was intended to be submitted. We think that defendants' instructions "K" and "L" had a tendency to confuse the jury and were, therefore, properly refused. [Deere v. Plant, 42 Mo. 60, 63; Clarke v. Kitchen, 52 Mo. 316.]

Complaint is made that the court erred in instructing the jury that they should disregard all evidence of the judgment assessing damages upon the injunction bond in the Moore case, that said judgment constituted no defense in this case. The facts show that the injunction was issued in 1908 and dissolved in 1910; that some of the defendants in the case at bar were sureties upon the injunction bond. Moore was the only party in the injunction case. The judgment rendered on the motion to assess damages was against Moore as principal and said defendants as sureties. The judgment under the injunction suit was for damages for which Moore alone was liable. The damages sought to be recovered in the case at bar were for acts of defendants in "unlawfully, wrongfully and maliciously" turning "the waters and

overflow waters of said Sugar Creek and causing them to flow onto, across, over and upon the said lands of plaintiff's intestate," while the damages that could have been recovered in the injunction case were on account of the acts of Moore in enjoining the repairing of the levee along Woolston's property. It was stated in Albers Commission Co. v. Spencer, 236 Mo. 608, 630—

". . . it may be stated as good and acceptable general doctrine that compensation for losses sustained by a defendant which are the actual, natural and proximate result of the wrong committed by the restraining order, while the latter is alive and operative, is the measure of damages to be assessed against bondsmen. Says High (2 High on Inj. (4 Ed.), sec. 1663) : "In estimating damages sustained by the improper issuing of an injunction, the courts proceed upon equitable grounds, and while it is difficult to fix any precise rule or standard for determining the damages upon dissolution, it may be said generally that nothing will be allowed which is not the actual, natural and proximate result of the wrong committed."

And it is stated in 34 L. R. A. (N. S.) 951 (note)— ". . . damages resulting from the acts of third persons are not so caused by the injunction as to render the sureties on the injunction bond liable, but are, at most, only remotely occasioned by the injunction."

There was evidence that at the time of the issuance of the injunction no waters were flowing through the broken levee of Woolston. Defendants strenuously deny this but the testimony of A. B. Woolston, found in respondent's additional abstract of the record is to this effect. He testified: "There was no water running on George (meaning George Woolston's land) from Sugar Creek in 1908 until after the swath was cut through there and throwed it out. There was no water there when he was enjoined." The witness Barnes, as shown in respondent's additional abstract of the record, testified that there was no water running through the swath

at the time the willows were cut and being placed.  No damages to the land or crops were asked or assessed upon the bond.  However, Woolston was not permitted to repair his levee during the pendency of the injunction suit and no doubt he could have recovered in that suit for damages, if any, resulting to him by reason of such prevention, but he could not recover any damages against the defendants in the case at bar for the reason that they were not parties to the suit, and, as before stated, this cause of action is for damages caused by their acts alone.  The petition asked only for those damages and the jury in plaintiff's instructions were confined to such damages as were suffered by plaintiff's intestate, caused by the affirmative acts of the defendants pleaded in the petition.  We think then that this suit was maintainable against the present defendants in the case and that the action of the court was proper.  It makes no difference if Moore was originally made a party to this suit; it did not go to the jury against him so we need not go into that.  The judgment in the injunction suit is not *res adjudicata*.

The judgment is affirmed.  All concur.